### IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| **NORTHROP GRUMMAN SYSTEMS CORPORATION,**<br><br>    Plaintiff,<br><br>        v.<br><br>**UNITED STATES,**<br><br>    Defendant. | Case No. <u>25-746 C</u> |

### COMPLAINT

Plaintiff Northrop Grumman Systems Corporation ("Northrop Grumman" or the "Company"), for its complaint against Defendant United States, alleges as follows:

### NATURE OF THE ACTION

1.      This is a suit pursuant to the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. § 7104(b)(1), challenging a May 14, 2024, Contracting Officer's Final Decision ("COFD") (Ex. A) demanding repayment of overtime premiums paid under U.S. Department of the Air Force ("Air Force" or "USAF") Contract No. F09603-00-D-0210 (relevant excerpts at Ex. B) for Total System Support Responsibility ("TSSR") for E-8C Joint Surveillance Target Attack Radar System ("JSTARS") aircraft.

2.      The COFD demands repayment of $12,440,550.00 in overtime premiums for maintenance and repair work that Northrop Grumman performed on JSTARS aircraft from 2014 to 2017.  There is no dispute that Northrop Grumman's personnel worked overtime to complete the work required or that the Company paid them the appropriate overtime premium for that work. Rather, the COFD alleges that Northrop Grumman wrongly sought and received reimbursement

for the overtime premiums—*i.e.*, the extra compensation the employees received for working overtime hours—under Federal Acquisition Regulation ("FAR") 52.222-2, "Payment for Overtime Premiums." The COFD claims this clause required Northrop Grumman to obtain the Government's advance approval before incurring any overtime costs. The COFD's demand for repayment fails for five reasons.

3.      First, the entire demand is time-barred under the CDA's six-year statute of limitations. The Government demands repayment of overtime premiums for calendar years 2014 to 2017, but the Government did not demand repayment of those premiums until the May 14, 2024 COFD, outside the statute of limitations.

4.      Second, the COFD rests on a misreading of FAR 52.222-2's plain language, which does not require a contractor to seek the Government's prior approval for overtime premium costs in certain listed situations, including those present here.

5.      Third, the COFD's misreading of FAR 52.222-2 also contravenes the Government's own pre-dispute statements and the parties' long-standing course of conduct. Indeed, the Government's own Contracting Officers explained to Northrop Grumman nearly two decades ago that the clause did not require the Government's prior approval in the listed situations.

6.      Fourth, even if the Government were correct that FAR 52.222-2 required Northrop Grumman to seek advance approval for overtime, the Government waived that purported requirement by paying all the invoiced premiums despite knowing that Northrop Grumman did not seek prior approval.

7.      Fifth, even if the Government's position were otherwise correct, it cannot recover because it suffered no damages. To the contrary, Northrop Grumman's use of overtime resulted in cost savings to the Government.

## PARTIES

8.      Plaintiff is Northrop Grumman Systems Corporation, having its principal place of business at 2980 Fairview Park Dr., Falls Church, VA 22042.

9.      Defendant is the United States, acting through the U.S. Department of the Air Force.

## JURISDICTION

10.      The Court has jurisdiction over this suit pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), and the Contract Disputes Act of 1978, 41 U.S.C. § 7104(b)(1).  This suit is timely filed within one year of May 14, 2024, the date of the COFD's issuance.

## BACKGROUND

### The TSSR Contract

11.      On September 15, 2000, Northrop Grumman and the Air Force entered into contract No. F09603-00-D-0210 (the "Contract") for the JSTARS TSSR program.  JSTARS was an airborne battle management, command and control, intelligence, surveillance, and reconnaissance platform.  Its primary mission was to provide theater commanders with ground surveillance to support attack operations and targeting.

12.      The Contract was an indefinite-delivery, indefinite-quantity vehicle that primarily involved cost-plus-award-fee and cost-plus-fixed-fee orders.  It required Northrop Grumman to provide scheduled depot-level maintenance and unanticipated repair work on JSTARS aircraft, among other tasks.  Northrop Grumman, acting through its Defense Systems (formerly Technical Systems) Sector, performed much of the maintenance and repair work in Lake Charles, Louisiana.

**Northrop and the Government Establish a Course of Dealing
With No Prior Approval of Overtime**

13.    The JSTARS aircraft was, by modern standards, antiquated.  The Boeing 707 airframe on which the aircraft was based dated from the 1950s.  The JSTARS fleet entered service in 1991, and the Air Force retired the last aircraft in 2023.

14.    This narrowed the pool of qualified maintenance personnel, as did the retirement of personnel who began working on the program when the Air Force first ordered the JSTARS aircraft in the mid-1980s.  Qualified personnel also proved difficult to attract and retain in the Lake Charles area, which is a challenging labor market for hiring mechanics with the necessary aircraft maintenance skills and certifications.

15.    Due to the limited number of JSTARS aircraft and the heavy demands on the fleet, the Contract included strict delivery timeframes.  The relatively small fleet was in high demand for missions in Iraq, Afghanistan, and elsewhere.  Underscoring its importance to the Air Force, schedule was an important component in fee scoring and performance ratings.

16.    Adding to the pressure to stay on schedule, JSTARS aircraft often had hidden problems that became apparent only as the maintenance team disassembled an aircraft and inspected its systems. This often resulted in extensive unplanned repairs.

17.    Combined, these factors mandated the frequent use of overtime by existing personnel to perform the Contract in compliance with the Government's strict deadlines.

18.    The Contract incorporated by reference the July 1990 version of FAR 52.222-2 "Payment for Overtime Premiums."  That clause, as maintained on the Acquisition.Gov website maintained by the General Services Administration, reads in full:

> (a) The use of overtime is authorized under this contract if the overtime premium does not exceed *_____ or the overtime premium is paid for work-

(1) Necessary to cope with emergencies such as those resulting from accidents, natural disasters, breakdowns of production equipment, or occasional production bottlenecks of a sporadic nature;

(2) By indirect-labor employees such as those performing duties in connection with administration, protection, transportation, maintenance, standby plant protection, operation of utilities, or accounting;

(3) To perform tests, industrial processes, laboratory procedures, loading or unloading of transportation conveyances, and operations in flight or afloat that are continuous in nature and cannot reasonably be interrupted or completed otherwise; or

(4) That will result in lower overall costs to the Government.

(b) Any request for estimated overtime premiums that exceeds the amount specified above shall include all estimated overtime for contract completion and shall-

(1) Identify the work unit; *e.g.,* department or section in which the requested overtime will be used, together with present workload, staffing, and other data of the affected unit sufficient to permit the Contracting Officer to evaluate the necessity for the overtime;

(2) Demonstrate the effect that denial of the request will have on the contract delivery or performance schedule;

(3) Identify the extent to which approval of overtime would affect the performance or payments in connection with other Government contracts, together with identification of each affected contract; and

(4) Provide reasons why the required work cannot be performed by using multishift operations or by employing additional personnel.

* Insert either "zero" or the dollar amount agreed to during negotiations. The inserted figure does not apply to the exceptions in paragraph (a)(1) through (a)(4) of the clause.

Https://www.acquisition.gov/far/52.222-2.

19. To fill in the blank in paragraph (a), the Contract included "'Zero' except as modified by Clauses H-901(d)(15) and H-924(g)." Clause H-901(d)(15) pertains to the award fee calculation, while clause H-924(g) and its successor clause H-955 pertain to deployed operations. Those clauses are not relevant to the dispute over Northrop Grumman's use of overtime at its Lake Charles facility.

20. Under the clause's plain language, therefore, Northrop Grumman could use overtime at its Lake Charles facility if the overtime premium did not exceed zero dollars "*or*" the Company used the overtime for one or more of the four reasons listed in FAR 52.222-2(a)(1) to (4).

21. The procedures in subsection (b) for seeking approval of overtime applied to "[a]ny request for estimated overtime premiums that exceeds the amount specified above." Those procedures, however, did not apply when the Company was relying on one of the four reasons listed in paragraph (a)(1) to (4).

22. From the earliest years of the Contract, Northrop Grumman used overtime at Lake Charles without the Government's prior approval, although the Government was fully aware of, agreed with, and indeed encouraged the Company's use of overtime.

23. Northrop Grumman did not request prior approval to use overtime because the reason in paragraph (a)(4) applied: the use of overtime, instead of hiring additional fulltime workers at Lake Charles, resulted in lower overall costs to the Government.

24. In many instances, the reason in paragraph (a)(1)—coping with emergencies, breakdowns, and bottlenecks—also applied due to natural disasters, such as hurricanes, and bottlenecks resulting from the combined effect of schedule demands and unforeseen repair requirements.

25.     In 2006—long before the present dispute arose—the then-Contracting Officers explained to Northrop Grumman that FAR 52.222-2 allowed overtime without prior approval and that Northrop Grumman therefore did not need to, and should not, request prior approval.

26.     Specifically, ███████, the Divisional Administrative Contracting Officer, explained to ███████, another Contracting Officer, that the clause "is easily parsed to display its two different applications." Email from ██████ (DCMA) to ██████ (USAF) & ██████████ (DCMA) re Payment of overtime premium (July 18, 2006, at 3:16 PM) (Ex. C). First, as ███████ explained, the clause authorizes overtime if the overtime premium does not exceed the specified amount in the first prong of paragraph (a). *Id.* Second, and separately, "'overtime is authorized under this contract if … the overtime premium is paid for work'" under one of the four reasons listed in paragraph (a)(1) to (4). *Id.* (quoting FAR clause).

27.     ███████ went on to explain that Northrop Grumman's expected use of overtime "is of the category depicted by the 'second' application of the clause." *Id.* That is, the Government expected Northrop Grumman to use overtime under one of the listed reasons rather than pursuant to a request for the Government's advance approval to exceed the specified dollar amount.

28.     Removing any doubt about the clause's proper interpretation, ███████ went on to explain that, "[b]ecause of the '***or***' nature of this 'second' application, the amount presently proposed for premium pay"—*i.e.*, the amount of overtime premium the Company estimated it would need to pay—"should not be used to 'fill-in' the blank amount in the 'first' application." *Id.* (emphasis in original). That is, the Government did not want the Company to seek advance approval for an estimated amount of overtime, because it instead expected the Company to use overtime under the second prong of FAR 52.222-2.

29.    Consistent with this understanding, ▮▮▮▮▮▮ informed Northrop Grumman that, although the blank in the clause would be filled in with zero, "NGC will be paid the overtime costs … for the contingencies listed in the clause … that are reasonable, allowable and allocable." Email from ▮▮▮▮▮ (USAF) to ▮▮▮▮▮ (NGC) re FW: Payment of overtime premium (July 18, 2006, at 5:09 PM) (Ex. D).

30.    ▮▮▮▮▮ sent ▮▮▮▮▮ email and her own email to Northrop Grumman. ▮▮▮▮▮ and ▮▮▮▮▮ both stated that Northrop Grumman agreed with their understanding.

31.    Thus, long before the current dispute arose, the Government stated in no uncertain terms that Northrop Grumman should use overtime for the reasons listed in paragraph (a)(1) to (4) without seeking approval from the Government to exceed the $0 amount.

32.    The parties also engaged in a long-standing course of dealing that conformed to the understanding that Northrop Grumman did not need to seek Government approval for overtime where one of the reasons listed in FAR 52.222-2(a)(1) through (a)(4) applied.

33.    The Government knew Northrop Grumman regularly used overtime, without advance approval, to achieve the Contract's rigorous schedule requirements.  In 2015, for example, Northrop Grumman sent the Air Force's Contracting Officers an analysis explaining, among other things, that its Lake Charles facility was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Northrop Grumman Presentation on Acceleration/Compression Request at 6, 8, 10 (Feb. 25, 2015) (attached to Letter from ▮▮▮▮ (NGC) to ▮▮▮▮ & ▮▮▮▮ (USAF) re Contract F09603-00-D-210, Total System Support Responsibility (TSSR) Delivery Order 0146, Acceleration/Compression Analysis – Submittal of (Mar. 2, 2015)) (Ex. E); *see also* Northrop Grumman Presentation on Acceleration/Compression Request at 6 (Sept. 9, 2014) (explaining that the Lake Charles facility



" and that "

") (attached to Letter from ███ (NGC) to ███, ███ & ███ (USAF) re Contract F09603-00-D-210, Total System Support Responsibility (TSSR) Delivery Order 0146, Acceleration/Compression Analysis – Submittal of (Sept. 11, 2014)) (Ex. F).

34.    Similarly, in 2017, Northrop Grumman sent the Air Force's Contracting Officer an analysis explaining that the Company was ████████████████████████ which necessarily involved the use of overtime.  Northrop Grumman Presentation on JSTARS – Acceleration - Compression Plan Request at 4, 5 (Sept. 6, 2017) (attached to Letter from ███ (NGC) to ███ (USAF) re Contract F09603-00-D-210, Total System Support Responsibility (TSSR) Delivery Order (DO) FA8529-17-F-0001, Acceleration/Compression Analysis – Submittal of (Sept. 7, 2017) (Ex. G).

35.    In addition, on numerous occasions during the annual negotiations to extend the Contract period, Northrop Grumman sought the Government's approval to hire more fulltime personnel at Lake Charles.  The Government rejected those requests, which the Government knew would require the Company to have its existing personnel work overtime.  Without additional fulltime employees, overtime was the only way for the Company to avoid the risk of mission failure.

36.    Further, Northrop's invoices and the accompanying documentation contained sufficient information for the Government to understand both the fact and the amount of Northrop's claims for the overtime premiums.

37.    At no point during the first two decades of the Contract—from 2000 until 2020— did the Air Force require Northrop Grumman to obtain Government approval to use overtime at

Lake Charles. To the contrary, the Air Force, including the Contracting Officers, knew Northrop Grumman was using overtime without the Government's prior approval and nevertheless paid the Company for the overtime premiums for twenty years.

## DCAA Adopts a New Interpretation of FAR 52.222-2

38. In 2018, the Defense Contract Audit Agency ("DCAA") began an audit of the TSSR program for calendar years 2014 to 2017. Based on the information Northrop Grumman had submitted with its invoices, DCAA determined that the Company had invoiced for overtime premiums and that the Government had paid the Company for those premiums. DCAA then raised concerns regarding the payment of the premiums.

39. DCAA was concerned that Northrop Grumman did not receive approvals from the Contracting Officer prior to incurring overtime premium expenses. DCAA asked Northrop Grumman both for evidence that one of the exceptions in FAR 52.222-2 applied *and* for evidence that Northrop Grumman had requested advance approval for the overtime premiums from the Contracting Officer.

40. Northrop Grumman responded by explaining that DCAA's concerns about the overtime premiums were unjustified for three reasons. Letter No. 042419 from █████████ to █████████ (DCAA) re DCAA Audit, 06851-2019C17900001, Overtime Premium Costs on contract F09603-00-D-0210 (November 25, 2019) (Ex. H). First, FAR 52.222-2 permits the use of overtime, without prior approval, to cope with the program's unpredictable work requirements and to achieve lower overall labor costs than the Company would have incurred with a larger permanent workforce. Second, the Government had expressly endorsed Northrop Grumman's understanding that the Contract does not require Government approval for the use of overtime where one of those reasons applies. Third, Northrop Grumman used overtime without

Government approval since Contract performance began in 2000, and there is no record of the Government questioning that practice prior to the audit.

41.     On January 8, 2020, a DCAA auditor issued a "Form 1" recommending that the Contracting Officer disallow $12,440,550.00 in overtime premium costs from 2014 to 2017 that the Government had already paid.  Notice of Contract Costs Suspended and/or Disapproved (Form 1) from DCMA to NGC (Jan. 8, 2020) (Ex. I).   The recommendation stated that Northrop Grumman "did not substantiate that any of the exceptions from FAR 52.222-2(a)(1) through (a)(4) is applicable."   DCAA, however, did not even attempt to dispute that the Company's use of overtime at Lake Charles resulted in lower overall costs to the Government consistent with FAR 52.222-2(a)(4) and also, in many instances, was necessary to cope with emergencies ████ ███████████████████████████████ consistent with FAR 52.222-2(a)(4).  Instead, the Form 1's determination that FAR 52.222-2(a)(1) to (4) did not apply was based on DCAA's position that the Government's advance approval was required even when one of those situations applied.

42.     In March 2020, to avoid any further dispute, Northrop Grumman agreed to seek the Government's advance approval for the use of overtime from that point forward.  Letter from ██ ██████ (NGC) to ████████ (USAF) re Contract F09603-00-D-0210, Total System Support Responsibility (TSSR), Delivery Order (DO) FA8529-19-F-0001, Overtime Premium Charging Authorization, at 1 ¶ 2 (Mar. 23, 2020) (Ex. J).  The Company stated, however, that it continued to believe FAR 52.222-2 did not require advance approval and that it was not conceding the Government's position regarding advance approval was correct.  *Id.* ("Northrop Grumman understands the additional guidance [requiring advance approval] to be over and above the authorization of Overtime Premium charging as described in FAR 52.222-2, and will comply with

the direction henceforth, however waives no rights or assertions as to the allowable nature of costs incurred and billed to date as a result of complying with said direction.").

43.     From that point through the end of Contract performance, the Government routinely approved the Company's overtime requests with only occasional, minor adjustments.

**The Air Force Eventually Issues the COFD**

44.     In 2019, the Air Force Office of Special Investigations ("AFOSI") opened an investigation into the Contract and requested and received thousands of records from Northrop Grumman.  While that investigation was pending, the Contracting Officer took no steps to seek recovery of the $12.4 million that DCAA alleged Northrop Grumman owed to the Government.

45.     On May 24, 2023, AFOSI ended its investigation with no further action.

46.     In September 2021, in response to a series of inquiries from Northrop Grumman about payment for overtime premiums the Company paid in 2019 and 2020, the Contracting Officer explained that the Government disagreed with the Company's position and concluded it "is my determination that NGC has not shown why a deviation from the stated overtime premium amount of $0 is warranted."  Email from ████████ (USAF) to ████████ (NGC) re TSSR LTR 2021-140 OTP August 2019- March 2020 (Sept. 17, 2021, 1:27 PM) (Ex. K); *see also* Email from ████████ (USAF) to ████████ (NGC) re TSSR LTR 2021-140 OTP August 2019- March 2020 (Sept. 21, 2021) (Ex. L) (asserting that Northrop Grumman "has not substantiated why these overtime premiums should be paid in accordance with FAR 52.222-22").  The Government, however, did not assert a demand for repayment of the overtime premiums for 2014 to 2017 at that time.

47.     In September 2023, in response to Northrop Grumman's renewed requests for payment of the 2019 and 2020 overtime premiums, the Contracting Officer—relying on DCAA's analysis—stated that FAR 52.222-2 required Northrop Grumman to seek prior approval before

incurring overtime costs. Memorandum from ██████ (USAF) to Northrop Grumman re Total System Support Responsibility (TSSR) F09603-00-D-0210, Review of Northrop Grumman Invoices for Overtime Premium (Sept. 25, 2023) (Ex. M). The Government, however, again did not demand repayment of the overtime premiums for 2014 to 2017.

48. On May 14, 2024, the Contracting Officer issued the COFD, which demanded repayment in the amount of $12,440,550.00, the amount that DCAA had recommended the Government disallow for overtime premiums in Contract years 2014 to 2017. The COFD claimed Northrop Grumman should repay the money due to Northrop Grumman's "failure to abide by the contract's terms and conditions," namely the alleged failure to seek prior approval for overtime work. This was the Government's first and only demand for repayment of the overtime premiums for 2014 to 2017.

49. The COFD was entitled "Demand for Payment and Final Decision on Government Claim" and described itself as a final decision under the Contract Disputes Act: "a Contracting Officer's Final decision is hereby rendered in accordance with FAR 32.605(a)(1)."

## COUNT I
### (STATUTE OF LIMITATIONS)

50. Northrop Grumman incorporates the preceding paragraphs as if set forth fully herein.

51. The CDA imposes a six-year statute of limitations between the accrual of a claim and the time the Government must submit a claim against a contractor. 41 U.S.C. § 7103(a)(4)(A). The FAR provides that "*[a]ccrual of a claim* means the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, monetary damages need not have been incurred." FAR 33.201.

13

52.     Government CDA claims accrue upon the submission of information that puts the Government on notice that the contractor sought an improper payment. *See Strategic Tech. Inst., Inc. v. Sec'y of Def.*, 91 F.4th 1140, 1145 (Fed. Cir. 2024) (holding that the Government's claim accrued upon submission of data needed to calculate contractor's final rates); *see also URS Fed. Servs., Inc.*, ASBCA No. 61227, Sept. 3, 2019, 19-1 BCA ¶ 37,431 at 181,926. Invoices put the Government on notice if the "sufficient information necessary" to determine the nature of the Government's claim was available. *See Raytheon Co. v. United States*, 105 Fed. Cl. 351, 353 (2012); *see also URS Fed. Servs.*, 19-1 BCA ¶ 37,431 at 181,926 (Government on notice if it "did not need any additional information, outside of the invoices themselves," to discover improper requests for payment). The Government is still on notice even if the invoice must be thoroughly analyzed to reveal the possible improper payment. *See Raytheon Co. v. United States*, 104 Fed. Cl. 327, 330-31 (2012) (Government on notice because it "had all the financial information that it needed" for over six years); *see also Sparton Deleon Springs, LLC*, ASBCA No. 60416, Dec. 28, 2016, 17-1 BCA ¶ 36,601 at 178,311 (Government on notice when voucher contained insufficiently supported costs); *cf. Raytheon Missile Sys.*, ASBCA No. 58011, Jan. 28, 2013, 13 BCA ¶ 35,241 at 173,017 (Government on notice when price proposal documented improper costs, even though documentation was so complex that officials from three agencies needed to review). A change in the Government's position, including a new DCAA opinion on what costs are allowable, does not create a new claim accrual date or restart the CDA's statute of limitations. *Raytheon*, 104 Fed. Cl. at 333.

53.     The Government's claims to recover the overtime premiums for calendar years 2014 to 2017 accrued upon Northrop Grumman's submission of each of its monthly invoices

including those premiums.  Northrop Grumman submitted the last of those invoices on March 1, 2018.

54.     Northrop Grumman's invoices contained sufficient information for the Government to determine that Northrop Grumman sought payment for the overtime premiums. Indeed, DCAA used this same documentation to determine that Northrop Grumman had invoiced and been paid for the overtime premiums.  The Contracting Officer likewise explained that the Government knew about Northrop Grumman's submission of claims for the overtime premiums based on "sampling of submitted vouchers and the initiation of an independent audit."  Ex. M at 5.

55.     In addition, based on the parties' longstanding course of dealing, including the Company's numerous explanations that it was using overtime to meet the Government's schedule demands, the Air Force knew Northrop Grumman was using overtime on the Contract, paying overtime premiums, and invoicing the Government for those premiums.

56.     The Government made its first and only claim for repayment of the overtime premiums for 2014 to 2017 in the COFD, which was dated May 14, 2024.

57.     May 14, 2024, is more than six years after March 1, 2018.

58.     As a result, the CDA's statute of limitations expired before the Government made its claim, and the COFD's demand for Northrop Grumman to repay the overtime premiums for 2014 to 2017 thus is untimely.

## COUNT II
### (CONTRACT INTERPRETATION:  PLAIN LANGUAGE)

59.     Northrop Grumman incorporates the preceding paragraphs as if set forth fully herein.

60.    "[T]he government bears the burden of proof to demonstrate that a cost is unallowable." *Voxtel, Inc.*, ASBCA No. 60129, 23-1 BCA ¶ 38,309); *see also Raytheon Co. v. Sec'y of Def.*, 940 F.3d 1310, 1311 (Fed. Cir. 2019) (citing *Parsons-UXB Joint Venture*, ASBCA No. 56481, 13 BCA ¶ 35,378); *Raytheon Co. v. United States*, 747 F.3d 1341, 1353 (Fed. Cir. 2014) (Government bears the burden of proof for a contractor's CAS noncompliance).    The Government cannot satisfy that burden here.

61.    FAR 52.222-2, which was incorporated into the Contract, governed the use of overtime and the payment of overtime premiums under the Contract.    That clause provides two ways that contractors are authorized to use overtime without seeking the Government's prior approval.

62.    First, Northrop Grumman was authorized to use overtime without the Government's prior approval if the overtime premium did not exceed a specified amount.    For the JSTARS Contract, that amount was "Zero."

63.    Second, Northrop Grumman was authorized to use overtime without the Government's prior approval if the overtime qualified under one or more of the four reasons listed in FAR 52.222-2(a)(1) through (a)(4).    Paragraph (a)(1) authorizes overtime if it is "Necessary to cope with emergencies such as those resulting from accidents, natural disasters, breakdowns of production equipment, or occasional product bottlenecks of a sporadic nature."    Paragraph (a)(4) authorizes overtime if it "will result in lower overall costs to the Government."

64.    The clause uses the disjunctive "or" to separate the two alternative ways that a contractor is authorized to use overtime without prior approval.    Under the rules of plain English grammar, this means either alternative is sufficient on its own.    *See, e.g., BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 195 F. Supp. 3d 776, 787

16

(E.D. Va. 2016) ("Notably, '[t]he language ... is disjunctive: if any of the ... elements is present, an anti-suit injunction may be proper.'") (quoting *Software AG, Inc. v. Consist Software Sols., Inc.*, 323 Fed. Appx. 11, 12 (2d Cir. 2009)).  Northrop Grumman thus was authorized to use overtime without prior approval if it satisfied one of the four reasons in FAR 52.222-2(a)(1) to (4), even if the cost of that overtime exceeded the amount specified in the first part of the clause.

65.    Paragraph (b) of the clause specifies the procedure for "[a]ny request for estimated overtime premiums that exceeds the amount specified above."  By its own terms, the request procedure in paragraph (b) is limited to requests to exceed the dollar limit in the first prong of paragraph (a).  It does not apply to the use of overtime under the second prong—*i.e.*, for the reasons listed in paragraph (a)(1) to (4).

66.    Paragraph (b) does not include a requirement to identify which of the four reasons listed in paragraph (a)(1) to (4) is applicable and to provide a supporting rationale and documentation for the contractor's reliance on that reason.  The absence of any such requirement confirms that paragraph (b) does not require a contractor to request the Government's approval when relying on the reasons listed in paragraph (a)(1) to (4).

67.    The version of FAR 52.222-2 in effect prior to July 1990 was structured differently.  In the pre-July 1990 version, paragraph (a) provided:  "The use of overtime is authorized under this contract if the overtime premium does not exceed *_____.  In addition to this dollar ceiling, overtime is permitted only for work" that falls within the four listed reasons.  FAR 52.222-2 (APR 1984); *see also* 48 Fed. Reg. 42,102, 42,529 (Sept. 19, 1983).  In 1990, the FAR Council amended FAR 52.222-2 to eliminate "In addition to this dollar amount, overtime is permitted only …" and replace it with "or".  *See* 55 Fed. Reg. 25,522, 25,532 (June 21, 1990).  As the FAR Council explained, the prior version of the clause "appear[ed] to impose a two-part requirement,

under which overtime was authorized only if it both fell under the stated dollar amount *and* came within one of the four listed reasons. *Id.* at 25523. In response to a request for clarification, the FAR Council deleted the conjunctive "[i]n addition to … overtime is permitted only …" language and replaced it with the disjunctive "or". In so doing, the FAR Council made it clear that a contractor could use overtime without prior approval if it either fell under the dollar limit *or* came within one of the four listed reasons.

68. At the time of this change, the FAR Council included a note explaining that "The inserted figure"—*i.e.*, the dollar limit over which approval for overtime is required—"does not apply to the exceptions in paragraph (a)(1) through (a)(4) of the clause." *See* 55 Fed. Reg. 25,522, 25,532 (June 21, 1990). Thus, consistent with the clause's plain language and structure, the note further clarifies that the clause does not require a contractor to obtain the Government's prior approval for overtime when the overtime comes within one of the four reasons listed in paragraph (a)(1) to (4). Instead, those four reasons are "exceptions" to the requirement to seek the Government's approval to exceed the dollar limit.

69. This explanatory language continues to appear in the version of FAR 52.222-2 maintained by the General Services Administration at Acquisition.Gov *See* https://www.acquisition.gov/far/52.222-2. Although it is currently omitted from hard-copy editions of the FAR, there is no indication that the FAR Council intended to alter this explanation of the proper reading of the clause.

70. The Government's interpretation of FAR 52.222-2 would require Government approval to use overtime whenever it exceeded the specified dollar amount regardless of whether it fell within one of the reasons listed in paragraph (a). This would render the list of reasons superfluous, which is contrary to basic principles of contract interpretation. *See Boeing Co. v.*

18

*Sec'y of Air Force*, 983 F.3d 1321, 1328 (Fed. Cir. 2020) (applying rule against surplusage to interpretation of a FAR clause); *accord TRW Inc. v. Andrews*, 534 U.S. 19, 32 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) ("It is a 'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'").

71.     Northrop Grumman's use of overtime during the challenged Contract years resulted in substantial cost savings compared to hiring additional fulltime employees at Lake Charles. Rather than disputing that the Company's use of overtime resulted in cost savings, the Government instead has focused only on whether the Company obtained advance approval for the overtime. Because Northrop Grumman's use of overtime resulted in lower overall costs to the Government, the Company's use of overtime was authorized under 52.222-2(a)(4).

72.     As the Company has also explained, Northrop Grumman needed to use overtime to cope with emergencies such as hurricanes and with production bottlenecks due to the JSTARS program's highly variable workflow and the Government's schedule demands.  For these reasons, Northrop Grumman's use of overtime was also authorized under 52.222-2(a)(1).

73.     In sum, Northrop Grumman's use of overtime was authorized under the plain language of FAR 52.222-2.  As a result, the Government cannot satisfy its burden of proof to show that the overtime premiums in question are unallowable due to Northrop Grumman's purported violation of FAR 52.222-2, and the COFD's demand for repayment thus must be denied.

## COUNT III
### (CONTRACT INTERPRETATION:  EXTRINSIC EVIDENCE)

74.     Northrop Grumman incorporates the preceding paragraphs as if set forth fully herein.

75.     Northrop Grumman's use of overtime was authorized under FAR 52.222-2's plain language.  However, even if the Court determines that FAR 52.222-2 is ambiguous, extrinsic evidence confirms that Northrop Grumman did not need to obtain the Government's approval to use overtime where one of the reasons listed in paragraph (a)(1) to (4) applies.  That extrinsic evidence includes both the Government's contemporaneous statements about the clause and the parties' long-standing course of dealing.

76.     One of the clearest forms of extrinsic evidence regarding the meaning of contract terms is a party's express agreement that the other party's interpretation is correct.  *See Gould Def. Sys., Inc.*, ASBCA No. 24881, 83-2 BCA ¶ 16,676, at 82,984 ("Once the Government unequivocally takes its stand and reads and applies the standard in the same manner as the contractor, it is essential that the contractor be entitled to rely on that joint interpretation until notified otherwise."); *Falcon Rsch. & Dev. Co.*, ASBCA No. 19784, 77-1 BCA ¶ 12,312, at 59,484 (same); *see also M.A. Mortensen Co. v. United States*, 29 Fed. Cl. 82, 96-97 (1993) ("Where, however, one party enters into a contract, knowing or having reason to know the meaning placed upon a provision by the other side to the conflict, the party is bound by that interpretation, if acquiescence to the other side's articulated understanding can be shown."); *Litton Sys., Inc. v. United States*, 196 Ct. Cl. 133, 148, 449 F.2d 392, 401 (1971) (Government cannot retroactively change its position after contractor's "long and consistent use of [cost accounting] method with the Government's knowledge, approval and acquiescence"); *Cresswell v. United States*, 146 Ct. Cl. 119, 127, 173 F. Supp. 805, 811 (1959) ("If one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning.  The same is true if he had reason to know what the other party intended." (citations omitted)); *United Tech. Corp. Pratt & Whitney Grp., Gov't. Engines and Space Propulsion*, ASBCA No. 46880, 46881, 97-1 BCA ¶

28,818 at 143,800 (parties' contemporaneous, pre-dispute interpretation carries substantial weight). That is precisely what happened here.

77.     In 2006—long before DCAA's 2019 disagreement with Northrop Grumman's interpretation or the Air Force's 2024 demand for repayment—the Government expressly endorsed Northrop Grumman's interpretation of FAR 52.222-2. ▉▉▉▉▉▉▉▉, the Divisional Administrative Contracting Officer, explained to ▉▉▉▉▉▉▉▉, another Contracting Officer on the JSTARS program, that the clause "is easily parsed to display its two different applications." Email from ▉▉▉▉▉ (DCMA) to ▉▉▉▉▉ (USAF) & ▉▉▉▉▉▉▉ (DCMA) re Payment of overtime premium (July 18, 2006, at 4:44 PM) (Ex. N). First, ▉▉▉▉▉ explained, the clause authorizes overtime if the overtime premium does not exceed the specified amount in the first prong of paragraph (a). *Id.* Second and separately, "'overtime is authorized under this contract if … the overtime premium is paid for work'" under one of the four reasons listed in paragraph (a)(1) to (4). *Id.* (quoting FAR clause). ▉▉▉▉▉▉ went on to explain that Northrop Grumman's expected use of overtime "is of the category depicted by the 'second' application of the clause." *Id.* That is, the Government expected Northrop Grumman to use overtime under one of the listed reasons rather than pursuant to a request for the Government's approval to exceed the specified dollar amount.

78.     Further confirming his agreement with Northrop Grumman's interpretation, ▉▉▉▉▉▉ explained that, "[b]ecause of the '*or*' nature of this 'second' application, the amount presently proposed for premium pay"—*i.e.*, the amount of overtime premium the Company expected to pay at that time—"should not be used to 'fill-in' the blank amount in the 'first' application." *Id.* (emphasis in original). Consistent with this understanding, ▉▉▉▉▉▉ informed Northrop Grumman that, although the blank in the clause would be filled in with $0,

21

"NGC will be paid the overtime costs … for the contingencies listed in the clause … that are reasonable, allowable and allocable. ███████ [of Northrop Grumman] has agreed to this." Ex. D at PDF 1. Thus, 13 years before DCAA chose a different interpretation, the Government stated in no uncertain terms that it understood and agreed that Northrop Grumman would use overtime under the reasons listed in paragraph (a)(1) to (4) rather than pursuant to a request for the Government's approval to exceed the $0 amount.

79.     When the Company shared this earlier correspondence with the Government, the Contracting Officer's only response was that this exchange occurred in connection with a different JSTARS contract. However, the language in question need not appear in the same contract; indeed, it does not even need to be identical. *See, e.g.*, *Huber, Hunt, & Nichols, Inc. v. Dep't. of Veterans Affairs*, VABCA No. 77-1 BCA ¶ 12,500 ("[P]rior conduct of the parties in construing identical *or similar* specifications is entitled to be considered in determining contractual intent in resolving disputes which subsequently arise, particularly when one or both of the parties have acted in reliance thereon.") (emphasis added); *see also Tibshraeny Bros. Constr., Inc. v. United States*, 6 Cl. Ct. 463, 470 (1984) (citing Restatement (Second) of Contracts § 249) ("[P]rior course of dealing can furnish an interpretation of a term to a contract, provided that the conduct which identifies that course of dealing can reasonably be construed as indicative of the parties' intentions and reflective of their common understanding."). In this case, the contract ███████ and ███████ were discussing included the same language, was between the same parties, and was for the same program. The Government, thus, is bound by the parties' agreed understanding of the clause.

80.    In addition to the Government's express agreement with Northrop Grumman's position, the parties engaged in a long-standing course of dealing that conformed to, and thus confirmed, Northrop Grumman's understanding of FAR 52.222-2.

81.    A consistent course of dealing provides strong evidence of the proper interpretation of a contract provision.  *See, e.g.*, *Metro. Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006) (parties bound by their course of dealing); *Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1290-91 (Fed. Cir. 2008) (citing *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1058 (Fed. Cir. 1983)) ("Because this court relies on this post-formation conduct to interpret the contract itself, the most accurate picture of the parties' intent for this contract is their conduct at a time when both parties still anticipated timely and full performance of the contract."); *Blinderman Constr. Co., Inc. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982) ("The conduct of both parties during construction and before the contractor's claim was submitted to the project manager provides persuasive evidence that the contract should be construed as urged by the contractor."); *see also Huber, Hunt, & Nichols, Inc. v. Dep't. of Veterans Affairs*, VABCA No. 77-1 BCA ¶ 12,500 ("No further authority need be cited for the proposition that where a Government agency responsible for the administration of contracts has followed a definite practice of interpretation for a long period of time, it will not be permitted suddenly to change its interpretation to the detriment of an individual who has acted in reliance of the Government's practice.").

82.    The Government was aware that Northrop Grumman regularly used overtime, without advance approval, to achieve the Contract's rigorous schedule requirements. ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ In addition, during the annual negotiations to extend the Contract period, the

23

Government repeatedly rejected the Company's requests to hire more personnel, which the Government knew meant the Company's existing personnel would have to work overtime to maintain the Government's aggressive schedule. And Northrop Grumman's invoices and the accompanying documentation, which included the overtime premium charges the Company incurred at Lake Charles, also contained sufficient information for the Government to understand that the Company was billing for the overtime premiums although it had not sought advance approval for that overtime.

83. Yet, despite knowing that Northrop Grumman was using overtime to perform the Contract, the Government for two decades—from 2000 until 2020—did not require Northrop Grumman to obtain advance approval for that overtime. That 20-year course of dealing further confirms Northrop Grumman's understanding that, as long as one of the reasons in paragraph (a)(1) to (4) applied, it did not need to obtain the Government's approval for overtime under paragraph (b) of FAR 52.222-2.

84. Northrop Grumman used overtime and paid its personnel overtime premiums for many years in reliance on the Government's statements about the correct interpretation of FAR 52.222-2 and on the parties' course of conduct.

85. In sum, the extrinsic evidence confirms that Northrop Grumman's use of overtime was authorized under FAR 52.222-2. As a result, the Government cannot satisfy its burden of proof to show that the overtime premiums in question are unallowable due to Northrop Grumman's purported violation of FAR 52.222-2, and the COFD's demand for repayment thus must be denied.

## COUNT IV
### (CONSTRUCTIVE WAIVER)

86. Northrop Grumman incorporates the preceding paragraphs as if set forth fully herein.

87.    For the reasons explained above, Northrop Grumman was authorized to use overtime, without the Government's approval, because at least one of the reasons listed in FAR 52.222-2(a) applied.  But even if the Government were correct that the clause required Northrop Grumman to obtain the Government's approval where one of those reasons applies, the Government constructively waived that supposed requirement.

88.    The Government can constructively waive contract requirements through its course of conduct.  *See Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 688 (1994); *see also Gresham & Co., Inc. v. United States*, 200 Ct. Cl. 97, 120, 470 F.2d 542, 555 (1972) ("[W]hether defendant has originally written an ambiguity into a contract, or has administered an initially unambiguous contract in such a way as to give a reasonably intelligent and alert opposite party the impression that a contract requirement has been suspended or waived . . . the requirement cannot be suddenly revived to the prejudice of a party who has changed his position in reliance on the supposed suspension."); *ECC Int'l, LLC*, ASBCA No. 60484, 18-1 BCA ¶ 37,203 at 181,114 ("A prior course of dealing, if established, can extinguish an otherwise explicit contractual requirement.").

89.    Constructive waiver requires the following four elements:  "(1) The [contracting officer] had notice that the work differed from contract requirement; (2) Action or inaction of the [contracting officer] indicated that the non-specification performance was acceptable; (3) The contractor relied on the [contracting officer's] action or inaction; (4) It would be unfair to permit the Government to retract the waiver."  *CJP Contractors, Inc. v. United States*, 45 Fed. Cl. 343, 376 (1999) (citations omitted); *see also Miller Elevator*, 30 Fed. Cl. at 688 (same).  Those elements are satisfied here.

90.     The Government, including the various Contracting Officers over time, knew that Northrop Grumman was using overtime without seeking the Government's advance approval. As explained above, during the years in question (and at other times as well) Northrop Grumman repeatedly sent the Government presentations explaining that the Company was "working extended work weeks and overtime." In addition, during the annual negotiations to extend the Contract period, the Government repeatedly rejected the Company's requests to hire more personnel, which the Government knew meant the Company's existing personnel would have to work overtime. Further, Northrop Grumman's invoices and the accompanying documentation, which included charges for the overtime premiums the Company incurred at Lake Charles, also contained sufficient information for the Government to understand that the Company was billing for the overtime premiums. And the Contracting Officers, who would have received any such requests, necessarily knew that the Company was not seeking their advance approval to use overtime.

91.     In fact, as described above, ███████████, the Divisional Administrative Contracting Officer, explained in 2006 that the Government expected Northrop Grumman to use overtime under one of the reasons listed in FAR 52.222-2(a)(1) to (4) rather than pursuant to a request for the Government's advance approval. And ███████████, another Contracting Officer on the JSTARS program, explained that the Government would pay the Company's reasonable, allocable and allowable overtime costs where one of those reasons applied.

92.     For all of these reasons, the Contracting Officers knew that Northrop Grumman was using overtime without seeking the Government's prior approval, in violation of the supposed requirement for advance approval under the Government's reading of FAR 52.222-2.

93.    By failing to object to Northrop Grumman's use of overtime without advance approval until 2020, the Contracting Officers indicated their acceptance of that practice.  Indeed, the Contracting Officers, ████████ and ████████, expressly stated their approval of that practice.  Moreover, the Government's payment of the Company's invoices without objection for over 20 years, as well as its demands that the Company devote adequate resources (which, as the Government knew, included overtime hours) to meet contractual schedules, further confirmed the Government's waiver of any requirement for advance approval for the use of overtime.

94.    Northrop Grumman relied on the Government's acceptance of the Company's use of overtime without prior approval.  The Company used overtime and paid the overtime premiums for two decades based on the understanding that it did not need to seek the Government's prior approval.

95.    The Company needed to use overtime to comply with the Contract's strict deadlines, to support warfighters by returning aircraft to service as soon as possible.  The Government has never disputed this.  The Company paid the appropriate amounts for that overtime.  The Government has never disputed this, either.  Once the Company agreed in 2020 to seek the Government's prior approval for overtime (while still maintaining that doing so was not required), the Government regularly approved those requests with only sporadic and minor adjustments.  The Company's use of overtime, therefore, was judicious and appropriate.  For all these reasons, it would be inequitable to allow the Government to retract its waiver of any purported requirement for Northrop Grumman to seek the Government's prior approval of overtime.

96.    In sum, even if FAR 52.222-2 required Northrop Grumman to seek the Government's prior approval to use overtime, the Government constructively waived that

purported requirement.  As a result, the Government cannot satisfy its burden of proof to show that the overtime premiums in question are unallowable due to Northrop Grumman's violation of FAR 52.222-2, and the COFD's demand for repayment thus must be denied.

## COUNT V
### (NO DAMAGES)

97.     Northrop Grumman incorporates the preceding paragraphs as if set forth fully herein.

98.     As explained above, FAR 52.222-2 did not require Northrop Grumman to obtain the Government's advance approval to use overtime or, in any event, the Government constructively waived any such requirement.  But even if the Government's advance approval was required and the Government did not waive that requirement, the Government has not shown and cannot show that it suffered any damages from Northrop Grumman's failure to obtain that approval.

99.     There is no liability where a contractual violation occurs but the party complaining of the violation fails to establish any damages.  *See Scott Timber Co. v. United States*, 692 F.3d 1365, 1376 (Fed. Cir. 2012) (liability for breach of contract requires the injured party to "establish that it suffered any damages"); *San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) (holding that Government must establish, *inter alia*, "damages caused by the breach" to recover for breach of contract); *Cosmo Constr. Co. v. United States*, 196 Ct. Cl. 463, 469, 451 F.2d 602, 605 (1971) (holding that "there must be some evidence of damage to support a finding of liability"); *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 344 (2005) (judgment of liability "requires a minimal showing of damages"); *see also Cramer Alaska, Inc.*, ASBCA No. 47725, Oct. 11, 1995, 96-1 BCA ¶ 27971 (applying time-honored principle of *injuria absque damno*).  Under this principle, even if Northrop Grumman violated the Contract by

28

failing to obtain the Government's advance approval for overtime, the Government is not entitled to recover because it has not shown and cannot show that it suffered any damages.

100.    As the party bearing the burden of proof to show the overtime premiums were unallowable, the Government must establish (among other things) that it suffered damages due to Northrop Grumman's failure to seek the Government's advance approval.  The Government has not met and cannot meet that burden.

101.    To the contrary, Northrop Grumman's use of overtime resulted in substantial savings for the Government.  Although the Government has contended that Northrop Grumman was required to obtain advance approval even when the use of overtime would result in cost savings, it has never offered any evidence that it suffered damages from the Company's use of overtime without advance approval.  Indeed, the Government has not even attempted to dispute that the Company's use of overtime at Lake Charles did in fact result in cost savings.  Given those undisputed savings, the Government cannot show that it suffered any damages.

102.    The Government's own conduct further confirms this point.  Starting in March 2020, Northrop Grumman, although continuing to dispute the Government's interpretation of FAR 52.222-2, agreed to seek the Government's advance approval for overtime.  From that time through the end of Contract performance, the Government consistently approved the Company's requests to use overtime, with only infrequent and minor adjustments.  As this course of conduct demonstrates, if Northrop Grumman had sought prior approval for overtime between 2014 and 2017, the Government would have approved those requests and enjoyed the savings that it did in fact enjoy due to the Company's use of overtime.  Alternatively, if the Government—contrary to the real-world evidence—had disapproved those requests, Northrop Grumman would have been forced to hire additional personnel to comply with the Government's demands for the Company

29

to adhere to the aircraft delivery schedules, which would have resulted in higher costs to the Government. This dose of reality refutes any attempt by the Government to show that it suffered damages due to Northrop Grumman's supposed failure to obtain advance approval for overtime.

103.   In sum, the Government suffered no damages due to, and in fact benefitted from, Northrop Grumman's use of overtime. As a result, the Government cannot satisfy its burden of proof to show that the overtime premiums in question are unallowable due to Northrop Grumman's purported violation of FAR 52.222-2, and the COFD's demand for repayment thus must be denied.

**PRAYER FOR RELIEF**

WHEREFORE, Northrop Grumman respectfully asks the Court to:

(i)      Grant judgment in Northrop Grumman's favor;

(ii)     Deny the COFD's demand to repay $12,440,550.00; and

(iii)    Grant such other and further relief as may be just and proper.

Dated: April 30, 2025

Respectfully submitted,

By:   J. Alex Ward

J. Alex Ward
Morrison & Foerster LLP
2100 L Street NW
Suite 900
Washington, DC 20037
Phone: (202) 887-1574
AlexWard@mofo.com

*Attorney of Record for Plaintiff*
*Northrop Grumman Systems Corporation*

*Of Counsel:*

James A. Tucker
Thomas Lee
Morrison & Foerster LLP

30

2100 L Street NW
Suite 900
Washington, DC 20037

31